**Donald PELLETIER, as Personal Representative of the Estate of Ronald H. Pelletier, Plaintiff**

v.

**Martin A. MAGNUSSON, et al., Defendants**

**No. CIV. 00–212–B–K.**

United States District Court, D. Maine.

April 17, 2002.

Tyler N. Kolle, Esq., Berman & Simmons, P.A., Lewiston, ME, for Plaintiff.

Diane Sleek, Susan A. Sparaco, Esq., Assistant Attorney General, Augusta, ME, Christopher C. Taintor, Esq., Norman, Hanson & Detroy, Portland, ME, for Defendants.

### MEMORANDUM OF DECISION [1]

KRAVCHUK, United States Magistrate Judge.

Donald Pelletier (Pelletier), the personal representative for the estate of Ronald Pelletier (Ronald), filed a complaint in the Maine courts seeking damages pursuant to 42 U.S.C. § 1983. Pelletier claims that the defendants' failure to prevent Ronald from committing suicide on October 3, 1998, while he was an inmate at the Maine

---

1. Pursuant to Federal Rules of Civil Procedure 73(b), the parties have consented to allow the United States Magistrate Judge to conduct any and all proceedings in this matter.

State Prison violated his constitutional rights. The matter was removed to this court. (Docket No. 1.) The defendants in the action break down into two distinct groups: "the medical defendants" and "the State defendants." Pelletier alleges that the defendants were deliberately indifferent to Ronald's safety in violation of the Eighth Amendment proscription of cruel and unusual punishment. In this decision I consider the summary judgment motion by the medical defendants: Michael Tofani, Bert Beverly, Cecelia Blake, and Allen Briggs. For the reasons articulated below, I **GRANT** the motion for summary judgment as to all the medical defendants.

## DISCUSSION

During the relevant time period, these four defendants were employees of Correctional Medical Services (CMS), a private contractor for the Maine State Prison (MSP). At the times relevant Doctor Michael Tofani was a licensed psychiatrist who treated patients on the Mental Health Stabilization Unit (MHSU) on a weekly basis. Cecelia Blake was a social worker working full-time during the weekdays on the MHSU at MSP. Doctor Bert Beverly was a medical doctor provided to the prison by CMS and treated Ronald at times. Allen Briggs was the regional supervisor of medical services for CMS and attended the Mental Health Clinic Meetings that addressed MHSU inmate care.

### A. *Summary Judgment Standard and State of the Record*

As movants, the defendants are entitled to summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). Pursuant to Local Rule 56, I limit my consideration of record materials to the parties' statements of material facts that are supported by citation to the record. D. Me. Loc. R. 56 ("The court shall have no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts."). In evaluating whether a genuine issue is raised I view all facts in the light most favorable to Pelletier, drawing all reasonable inferences in his favor. *Santiago–Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 52 (1st Cir.2000).

However, I do not give weight to every fact that Pelletier has attempted to place before the court in his response to the defendants' motion. As both these and the State defendants point out (*see* Reply Mem. to Med. Defs.' Mot. Summ. J. at 2 n. 1; Reply Mem to State Defs.' Mot. Summ. J. at 1–2 & n. 1), Pelletier's opposing statement of material facts does not contain a separate section of additional facts set forth in numbered paragraphs in a separate section. *See* D. Me. Loc. R. 56(c). Consequently, the defendants' replies to Pelletier's opposing pleadings do not include an opposing statement of material fact as envisioned by subsection (d) of Local Rule 56. To the extent that Pelletier has propounded additional facts that do not qualify or dispute the defendants' statements of fact I have disregarded them for purposes of passing on these motions.[2]

---

2. In his reply to these defendants Pelletier refers to his responses to the State defendants' statement of material fact on the grounds that it saves space and repetition. This practice makes the Court's job very difficult and time consuming. I have done my best to consider properly supported cross-referenced factual assertions when there is a disputation or qualification (*see, e.g.,* Pl.'s Resp. Med. Defs.' SMF ¶ 5; Pl.'s Resp. State

## B. Facts Not Disputed and In Dispute

It is not disputed that Ronald Pelletier hung himself with his belt on Saturday, October 3, 1998, in his cell on the stabilization corridor of the MHSU at the MSP.

### 1. The Correctional Medical Services Personnel

#### a. Not disputed

Doctor Michael Tofani is a psychiatrist who has been licensed to practice in Maine since 1978. In addition to maintaining a private practice since 1978 he has worked in correctional mental health at MSP as a consultant and then for CMS and Prison Health Services, after privatization of some parts of the health care delivery at the prison. While Ronald was at MSP Tofani provided consulting psychiatric services for the prisoners, including Ronald, under his contract with CMS. His responsibilities included evaluating inmates, initiating treatment, accepting consultation referrals from members of the mental health team, and consulting with the team.

The mental health team included, minimally, a member of the nursing staff, a mental health social worker, and a representative of the security staff. Before State defendant Doctor Stuart Zubrod went on medical leave, a psychologist headed the team.

Defendant Cecelia Blake worked for the Maine Department of Corrections from 1973 until 1998. At first she was a nurse in the infirmary of MSP and from 1988 until 1998 she was a social worker. When she retired as a Maine State employee she resumed work at the prison as an employee of CMS, which employed Blake in the middle of August of 1998.[3] Blake's duties as a CMS employee were to be available to the inmates housed on the MHSU, to transcribe orders given by Tofani when he consulted at the prison, and to make sure the inmates were safe and took their medications.

#### b. Disputed or qualified

The defendants assert that defendant Allen Briggs' CMS responsibilities were "purely administrative." Pelletier qualifies this description, asserting that those administrative duties included participating in clinic meetings where decisions about patient care were made (Tofani Dep. at 32–33; Pl.'s Resp. State Defs.' SMF Tab 5 at 26–31) and discussing with Tofani whether there should be increases in psychiatric care (Tofani Dep. at 11).[4]

### 2. Staffing of the MHSU

#### a. Not disputed

Doctor Zubrod, a psychologist, was the clinical director of the MHSU. He went on

Defs.' SMF ¶ 35) as opposed to an additional fact that is not set forth in a separate statement as required under the rules (see, e.g., Pl.'s Resp. Med. Defs.' SMF ¶ 3; Pl.'s Resp. State Defs.' SMF ¶ 30).

3. Without admitting or denying this paragraph, Pelletier refers to his response to the State defendants' statement of material facts in which he asserts that Blake was allowed to become a social worker on the condition that she do two years of supervised work under a social worker with a Master's degree. (Pl.'s Resp. Med. Defs.' SMF ¶ 5; Pl.'s Resp. State Defs.' SMF ¶ 35.) It is hard to read this as a qualification of the defendants' assertion about Blake's background. Similarly, Pelletier's assertion that the first notes in her handwriting on the MHSU appear around August 18, 1998, is unremarkable given the defendants' assertion that this was the time period during which Blake commenced work for CMS.

4. Pelletier also asserts that Briggs, as regional supervisor of medical services for CMS, would be the person to resist more costly medications, citing pages 52 and 53 of Tofani's deposition. This testimony does not refer to Briggs's role.

a health-related leave of absence in June 1998 and Paul Lipman, a licensed clinical social worker, assumed his responsibilities.[5] Zubrod and Lipman are state defendants. Blake and Lipman were the only two clinicians assigned full-time to the MHSU. The MHSU had a maximum capacity of thirty beds. Blake was the medical department's representative on the "treatment team," and Lipman was the representative of the mental health department.[6] Blake worked weekdays, but not evenings and weekends.

#### b. Disputed or qualified

The defendants assert that Lipman, like Blake, worked weekdays but not evenings or weekends. However Lipman was on-call when he was not present at the prison. Pelletier qualifies the representations about coverage, noting that Lipman testified that the on-call system was relatively new during the period at issue here and that this newness might have impacted the exercise of the prison staff's judgment as to whether or not to call in mental health staff. (Lipman Dep. at 14–16.) Pelletier also asserts that there were no mental health workers on the MHSU in the late afternoon, evenings, and throughout the night. (Lipman Dep. at 32–33.) There were no mental health workers assigned to the MSHU other than Blake and Lipman. (Blake Dep. at 12; Lipman Dep. at 9.) Pelletier cites to testimony in the record

that indicates that Diane White, a nondefendant licensed social worker, came in "some Saturdays" (Stewart Dep. at 25; see also Lipman Dep. at 16), "usually" on Saturdays (Lipman Dep. at 32–33), but that she was not in on a Saturday in September when Lipman was called-in because of Ronald's mental state (Lipman Dep. 16.) With respect to this final assertion, it appears that Lipman was actually testifying that White was not there on October 3, 1998.

The defendants assert that Blake was satisfied that there was adequate coverage because of the availability of members of the prison health care staff on weekends. I agree with Pelletier that the referenced testimony is equivocal. (See Blake Dep. at 19–20.)[7] Blake professed a lack of familiarity with the specifics of the evening and weekend availability of mental health staff and admitted that there were discussions regarding the lack of coverage on weekends. (Id. at 19–20, 34–35.)

The defendants assert that Blake at all times reported to a superior, first Zubrod then Lipman, both employees of the Maine Department of Corrections. Pelletier qualifies this assertion, citing deposition testimony by Blake that described the period in which Zubrod took his leave as "very difficult" and the question of who was her immediate supervisor as "a very difficult question." (Blake Dep. at 11–12.)

---

5. Cross-referencing a reply to the State defendants' statement of material facts, Pelletier attempts to insert additional facts about Lipman's training and work history. (Pl.'s Reply State Defs.' SMF ¶ 33.) See footnote 2. I disregard these.

6. Pelletier attempts to dispute this statement of fact by citing to Lipman's deposition testimony describing the treatment team as including security and medical staff members. (Pl.'s Reply State Defs.' SMF ¶ 36.)

7. The defendants assert that there was always at least one member of the healthcare staff

available in the MSP at night and on the weekend if an inmate needed to be seen. However the cited deposition testimony by Blake does not support the conclusion that on evenings and weekends there was always a mental healthcare staff member present at the prison. (See Blake Dep. at 18.) Though Pelletier attempts to qualify this statement by reference to his response to a similar factual assertion made by the State defendants (Pl.'s Resp. State Defs.' SMF § 13) the connection is too attenuated for this court to draw.

### 3. The Structure of the MHSU

#### a. Not disputed

On the MHSU there were four levels of supervision and care broken down into four distinct corridors. The acute corridor was for inmates who were extremely psychotic and who were an immediate danger to themselves or others. The prisoners were not allowed clothing although at times they were provided with a "safety garment" and a "safety blanket." Inmates were under constant camera monitoring and were either monitored continuously or in fifteen-minute physical checks.

The sub-acute corridor was for inmates who were no longer in acute crisis and were not a current danger to themselves or others. Staff physically checked the inmates every fifteen minutes but there was no camera monitoring. These inmates wore state-issued clothing with no belts. They were allowed an hour of exercise on the corridor each day.

Inmates were placed on the stabilization corridor when it was determined that they would benefit from a more therapeutic environment, with more light, more freedom of movement, and more privileges. Cells were monitored by guards at thirty-minute intervals and were not monitored with cameras. The inmates could interact in an open corridor and had access to a television, exercise equipment, and game tables. They were allowed their personal clothing, including belts.

The respite corridor was for inmates who were ready to return to the general population. These inmates could go back and forth between MHSU and the general population.

With regards to MHSU placement decisions, in addition to members of the treatment team, a guard would have the authority to make a temporary transfer of an inmate to a more secure location if a crisis arose. Doctor Beverly had no role in determining Ronald's housing placement during Ronald's time at MSP.

#### b. Disputed or qualified

The defendants assert that decisions about where inmates are to be housed from time to time are made exclusively by the treatment team, who are the people "on site." Doctor Tofani had nothing to do with setting up the MHSU, provided no input into its structure, and was not included on these teams. Pelletier acknowledges that Tofani had no input into the set-up or design of the MHSU, but states that Tofani's duties included consulting with the team and that he was in fact a member of these teams. (Tofani Dep. at 6, 12–13.)[8]

The defendants also assert that Briggs had no role in determining Ronald's housing placement. Pelletier states that Briggs' authority and involvement in these decisions included participation in the treatment team meetings where these placement decisions were made. (Tofani Dep. at 32–33; Pl.'s Resp State Defs.' SMF Tab 5 at 26–31.)

---

8. As with the response to the State defendants' statement of material fact Pelletier argues that key documentation is missing. He states that Tofani testified that there was documentation on every formal treatment team meeting (see Tofani Dep. at 29), that if Tofani ordered a change in security he would have to document this (id.), and because this is missing it is not clear what Tofani's role was in the decision to move Ronald. (Pl.'s Resp. Med. Defs.' SMF ¶ 28.) However, I am not sure what documentation it is that Pelletier is talking about in this response. If Tofani never ordered a change in security there would be no documentation. Other entries in the record show that Ronald moved to different corridors without formal treatment team documentation.

### 4. Training of the Correctional and Security Staff

#### a. Not disputed

Doctor Zubrod was the medical or clinical director of the MHSU from its inception.

#### b. Disputed or qualified

The defendants assert that the MSP correctional staff must take a comprehensive six-week training course on correctional practices when they are hired. (Bartlett Dep. at 9; Stewart Dep. at 4–5.) As part of this comprehensive training course correctional staff are trained to recognize the risks of inmate suicide. (Bartlett Dep. at 10; Stewart Dep. at 5.) The training received by the staff of the MHSU was "a fairly high level" vis-à-vis mental health knowledge and recognition of people at risk. (Peterson Dep. at 65–66.) After State defendant Officer Stewart started work on the MHSU he received additional verbal training from the mental health staff on how to recognize the suicidal tendencies of inmates. (Stewart Dep. at 6.) When State defendant Bartlett was assigned to work in the MHSU he received some additional training respecting inmate restraints and recognizing the effects of certain medications on inmates. (Bartlett Dep. at 11.) Additionally, members of the treatment team gave informal training to MHSU guards. (Lipman Dep. at 11.) Tofani had no role in training the employees of the Department of Corrections, and never had a contractual obligation or assumed any responsibility for training of the correctional staff. (Tofani Dep. at 13; Tofani Dep. at ¶¶ 3–4.)

Pelletier contests the defendants' factual assertions vis-à-vis training sessions for the new unit conducted by Maine's Department of Mental Health, Mental Retardation, and Substance Abuse, sessions that the defendants state covered suicide. (See State Defs.' SMF ¶ 16.) He also disputes the assertion that defendants Roach and Zubrod oriented the MHSU staff on January 1, 1998, to "the physical structure, security post orders, the working alliance of the mental health personnel and security staff, procedures for handling emergency situations, and suicide detections, prevention and intervention." (State Defs.' SMF ¶ 17.) Pelletier cites to Stewart's deposition indicating that when he was posted to the unit he had no additional mental health training to supplement the initial six-week training he received when he first qualified as a corrections officer. (Stewart Dep. at 5, 7–8, 72.) Stewart received only information on a day-to-day basis and had not seen written policies prior to this litigation. (Id. at 6–7, 71–72.) Defendant Bartlett had never seen the "MHSU Suicide Prevention and Intervention Policy" prior to this suit and his only training in suicide prevention had been when he first joined the Department of Corrections. (Bartlett Dep. at 9–12, 52–53.) Defendant Lipman, who was clinical director for the MHSU during Ronald's detention, was hired to teach the initial training module on suicidal ideation for the Department of Corrections. (Lipman Dep. at 8, 11–12.) The only training on the MHSU Lipman speaks of providing was "informal," such as describing schizophrenia and its symptoms. (Id. at 11.) He also was vague as to whether there were written policies available. (Id. at 28–29.) With respect to Tofani and training, Pelletier does not dispute that Tofani had no contractual obligation to train the correctional staff but asserts that, while he did not formally train staff members he did have conversation with them about what to watch for in certain inmates. (Tofani Dep. at 73–74.)

With respect to the defendants' assertion that prior to Ronald's suicide there

had been no suicides or attempts on the MHSU (*see* Bartlett Dep. at 60–61), Pelletier observes that the MSP does not keep statistics on attempted suicides (*see* Pl.'s Resp. State Defs.' SMF, Merrill Interog. 13).

### 5. Communication Between Correctional and Mental Health Staff

#### a. Not disputed

During the times relevant to this suit, when starting their shift on the MHSU incoming guards would be briefed by the guards they replaced. The incoming guards would also review one log book maintained by Blake and two separate log books maintained by correctional staff.[9] Sometimes the guard would speak with Lipman or Blake who would tell them if there was anything out of the ordinary going on and identify inmates who were having a bad day. The correctional staff was also expected to inform the mental health staff about their interactions with the MHSU inmates.

#### b. Disputed or qualified

The defendants describe Officer Bartlett as being under the impression that Blake tried to keep a close eye on how the MHSU inmates were doing so that she could keep the guards informed. (Bartlett Dep. at 72–73.) Pelletier responds by disputing whether this impression had any basis. He notes that Bartlett stopped working on the MHSU in August of 1998

and worked the MHSU on October 3 only as a fill-in for another guard. (Bartlett Dep. at 8–9.)

### 6. The Clinical Operations of the MHSU

#### a. Not disputed

Within twenty-four hours of an inmate's admission to the MHSU the treatment team would meet to *review his records.* (Lipman Dep. at 35–36.)[10] The treatment team of the MHSU would typically create a treatment plan for each inmate housed in the unit; this plan would consist of, among other things, the goals of treatment, the medication regimen, recommendations for group activities and outdoor exercise, and other matters related to a particular inmate.[11] Members of the mental health team would meet every Thursday. One representative from the security staff would attend. In the meeting they would discuss mental health concerns people present had about any inmate in the correctional system.

Tofani visited the MSP at least once a week, on Tuesdays, and was available on-call in the event of a crisis. He was always responsive to the mental health needs of the inmates when called by the treatment team. Members of the treatment team would decide which inmates needed Tofani's attention during his weekly visits. Tofani would be given a schedule that identified the patients to be seen and that indicated their presentation and the

---

9. With respect to these log books Pelletier cites to the fact that documentation is missing. There does not appear to be any relevant "missing" documentation in the Cecelia Blake log as the last day she worked prior to Ronald's death was October 1 and those entries are in the log.

10. Pelletier denies that this practice was carried out. However the cross-referenced support for his dispute does not contravene the

limited scope of the defendants' assertion. (*See* Pl.'s Resp. State Defs.' SMF ¶¶ 47–48.) The facts asserted are in the nature of additional facts that should have been asserted in a separate statement of material fact in accordance with Local Rule 56.

11. Pelletier admits this assertion but states that no treatment plan for Ronald has been produced.

team's concerns. Tofani could also arrange to see an inmate if he received a page or a call outside his regular visiting time.

Tofani prescribed psychotropic medications for certain inmates. His standard practice was to limit the amount of time that would elapse between visits with an inmate who was receiving psychotropic medication. His contact would be frequent enough to monitor the inmate's response to the medications.

Doctor Beverly's role on the MHSU was limited to being a back-up for Tofani if he was unavailable.[12]

### b. Disputed or qualified

The defendants assert that the treatment team would hold monthly meetings with inmates on the MHSU during which they would inquire into the inmates' needs and concerns. (Blake Dep. at 49.) They also state that individual and group therapies were made available to all inmates on the MHSU. (Lipman Dep. at 29.) Pelletier counters that this assertion is in dispute in light of the missing documentation for the meetings that were supposed to be documented. (Pl.'s Resp. State Defs.' SMF ¶ 40; Tofani Dep. at 29.)

The defendants claim that Briggs "had no clinical responsibility whatsoever on the MHSU." (Lipman Dep. at 75.) Pelletier reasserts that Briggs participated in the clinic meetings where treatment decisions were made and that he had authority to

approve increases in psychiatric care. (Tofani Dep. at 11, 32–33; Pl.'s Resp State Defs.' SMF Tab 5 at 26–31).

### 7. Treatment of Ronald Pelletier on the MHSU

#### a. Through August 1998

#### i. Not disputed

Ronald was transferred to MSP from the Maine Correctional Center on July 30, 1998. The mental health team spent more time working with Ronald than with most inmates on the MHSU.

Upon Ronald's admission to the MHSU the treatment team met to review his medical records.[13] Ronald was first seen by Tofani on Sunday evening, August 2, 1998. Ronald presented as a patient with a history of severe mental illness who had been in treatment, was continuing treatment, and appeared stable. On that first visit and throughout his admission to the MHSU he exhibited a severe thought disorder marked by paranoia and delusions. Tofani saw Ronald again on August 3, at which time Ronald was agitated and experiencing auditory hallucinations and Tofani learned that Ronald had been experiencing these problems for some time. Tofani entertained a provisional diagnosis of schizoaffective disorder, which describes a severe thought disorder marked by delusions and hallucinations along with lability of mood. On August 3, 1998, Tofani wrote an order for Lorazepam, a muscle relaxant and

---

12. Pelletier attempts to qualify this statement suggesting the cited testimony by Lipman was limited to representing that Beverly was there as a back-up if there was a need to prescribe drugs for someone like Ronald. I think the record supports the assertion made by the defendants (*see* Lipman Dep. at 74–75) and the fact that Beverly was the medical director of MHSU (*see* Tofani Dep. at 18) does not qualify or dispute this statement (Pl.'s Reply Med. Defs.' SMF ¶ 59).

13. Pelletier responds to these two statements by cross-referencing additional facts in his response to the State defendants' statement of material facts. (Pl.'s Resp. State Defs.' SMF ¶¶ 46–48.) These are all additional facts to which the defendants did not have the opportunity to respond so I do not consider them for purposes of this motion.

sleep inducer, to supplement the Haldol and Cogentin that Ronald was already receiving.[14]

On August 5, 1998, Doctor Beverly ordered intramuscular injections of long acting Haldol for Ronald. Ronald was also receiving daily doses of short-acting Haldol. The use of both long-acting and short-acting Haldol was an appropriate choice of medication to address Ronald's psychotic symptoms.

Tofani next saw Ronald on August 18, 1998. Ronald was despondent and continued to hear voices, but was capable of communicating with Tofani about the hallucinations and could be distracted from them by engaging in human interaction. At this point Tofani discontinued the Tegretol that Ronald was receiving and ordered Amitryptilene. He discontinued the anticonvulsant Tegretol because he thought that it was no longer necessary, seeing no history of a genuine seizure disorder and suspecting that this medication had initially been ordered to treat seizures associated with detoxification. Blake notified Tofani by phone on August 20 that Ronald felt that the newly prescribed Amitryptilene was making him too sleepy during the day; as a result Tofani ordered it discontinued.

As already noted, Blake commenced work as a CMS employee on the MHSU in the middle of August 1998. When she first encountered Ronald he was very frightened and emotional, and would easily cry. Blake spent a great deal of time trying to calm Ronald, help him adjust to prison life, and help assure he took his medications. Blake saw Ronald's condition change on a day-to-day basis and sometimes during the course of the day. During his entire stay on the MHSU Ronald cycled rapidly from one emotional state to another. Most often he presented to Blake as a patient who was frightened and needy, requiring and receiving a great deal of attention. However, he was able to function quite well at times. Ronald consistently said things that either overtly or implicitly expressed his desire to die.

When Ronald showed signs of being imminently self-destructive he was placed under constant watch on the acute corridor. When he told the staff that he was feeling better and when he exhibited behavior that was not psychotic he was moved to a less restrictive and healthier environment.[15]

Blake believed that Ronald generally did best and was most stable when he was on the stabilization corridor. The increased

14. Pelletier adds to these facts. He states that Ronald suffered the entire time he was on the MHSU from severe thought disorder, delusional thought, and paranoid thoughts. (*See* Tofani Dep. at 26.) He remained psychotic for the entire time he was on the MHSU. (*See id.* at 46, 72.) Though ultimately relevant to his case Pelletier's assertions that Ronald tried to commit suicide on August 4, that no mental health worker was notified, and that he was only seen by an LPN who was not licensed to make nursing assessments in Maine (*see* Spiller Dep. Ex 1 at 169–70) goes beyond qualifying or disputing the defendants' statements concerning Tofani's initial assessments.

15. With respect to this assertion Pelletier, cross referencing his response to the State

defendants' statement of material fact, states that the medical doctors recognized that Ronald's comments and behavior were not reliable gauges of what was going on in his head. (Pl.'s Resp. Med. Defs.' SMF ¶ 81; Pl.'s Resp. State Defs.' SMF ¶¶ 64, 118.) He also asserts that Ronald was transferred for reasons unrelated to his safety. (Pl.'s Resp. Med. Defs.' SMF ¶ 81; Pl.'s Resp. State Defs.' SMF ¶ 53.) The only portion of this response that relates to the transfers and that can be fairly characterized as a qualification of the defendants' statement of fact is that Spiller picked up a pattern of transferring Ronald to a lower level of supervision on Fridays. (Spiller Dep. Ex. 1 at 188–89.)

activity and opportunity for social interaction on this corridor was perceived by the treatment team to be beneficial to Ronald. To try and prevent Ronald from harming himself, Blake attempted to remind him "that he was a good person, that he was loved and what he did was bad, but that he was not a bad person." She took Ronald out for walks as often as possible. She perceived that the attention that she gave him and the opportunities to interact with other inmates in the general prison population made him feel special. When Ronald refused to eat his meals Blake would sometimes go into his cell and sit with him to persuade him to eat.

The guards on the MHSU sometimes placed a radio outside Ronald's cell to give him comfort.

### ii. Disputed or qualified

The defendants state that Ronald was on the acute corridor from the time he was admitted until August 8, 1998, at which time he was transferred to the subacute corridor. (Lipman Dep. at 43–44.) On August 10, he was moved to the stabilization corridor where he remained until August 16, at which point he was transferred to the acute corridor. (Id. at 45.) Pelletier disputes this description of Ronald's transfers. He states that the records show that Ronald was transferred from acute (notated as MH–4) to subacute (notated as MH–3) on August 3 and back to acute on August 4. (Lipman Dep. Ex. 7.) On August 7 he was transferred to subacute. (Id.) He was transferred to MH–1 on August 10, and to acute on August 16. (Id.) On the next day, August 17, he was transferred to MH–1 then to acute on August 20. (Id.) He was back on MH–1 on August 31 and was moved the same day to the subacute corridor. (Id.) On September 2, Ronald was on the acute corridor again, and was moved back to subacute on

September 4, then back to acute on September 5. (Id.) On September 8 he was moved to subacute and then back to acute. (Id.) On September 9 he went to the subacute corridor. (Id.) On September 14 he was transferred to the acute corridor and was moved to the subacute corridor on September 16. (Id.) On September 18 he made his final transfer to MH–1 where he stayed until his death. (Id.) (There are also record references that after September 18 there were brief stays back on the more restrictive corridors.)

The defendants assert that after his August 18 session Tofani next saw Ronald on August 25, at which time Ronald was somewhat improved. He was eating, sleeping better, and cooperating in taking his medications. (Tofani Dep. at 36–38.) At this point Tofani's short-term goal for Ronald was to help him improve to the point where he could safely be housed in an area other than the acute corridor. (Id. at 41.) There were no windows on the acute corridor, and Tofani wanted Ronald exposed to some sunlight in order for him to pay attention to his normal biological rhythms and to be distracted somewhat from the frightening thoughts that otherwise preoccupied Ronald's mind. (Id. at 43.) Tofani also felt it was important for Ronald to have enhanced opportunities for exercise and human interaction and to be relieved from the indignities and deprivations attendant with being on the acute corridor (factors that could make Ronald's condition worse). (Tofani Aff. ¶¶ 6–7; Tofani Dep. at 84.)

Pelletier "does not admit" this characterization of Ronald by Tofani. His record disputation is that at the time of the August 25 session, Ronald was on the acute corridor. (Pl.'s Resp. Med. Defs.' SMF ¶¶ 68, 72.) At this time Ronald could not tolerate a lot of stimulation and the stabili-

zation corridor was very noisy and chaotic. (Tofani Dep. at 44–46.)

The defendants assert that during this time period Blake's interactions with Ronald became more frequent overtime. And, as the guards became more familiar with Ronald they called Blake more frequently to let her know that Ronald needed to be seen. (Blake Dep. at 83.) Pelletier retorts that the contradictions in the various logs render any information in the logs suspect, (see Spiller Dep. Ex. 1 at 188), and that there is no documentation of the more frequent calls from the guards.

### b.  September 1 through September 15

#### i.  Not disputed

Tofani next saw Ronald on September 1. Ronald was having a difficult time coping with the level of auditory stimulation on the unit. Although Tofani wanted Ronald to have the opportunity for human interaction he recognized that the environment could overwhelm him. Consequently, while Tofani did not want to move Ronald back to the more restrictive environment he sought to find ways to decrease Ronald's physical stimulation. At this point Tofani changed the time when Ronald received his Lorazepam to bedtime.

Tofani saw Ronald again on September 8. Ronald's condition had deteriorated and he was becoming self-destructive. As of this date Tofani was not sure whether the conditions under which Ronald was living had contributed to the return of his symptoms or whether additional time was required to see whether the Haldol would work for him. On September 8, to compliment the Haldol, Tofani ordered "Respiridone," "a newer generation atypical anti-

psychotic" with which Tofani had enjoyed a great deal of success. This change was made because Ronald was constantly concerned about his medications and their side effects. Tofani believed that he could make Ronald feel better without increasing the Haldol by making this medication change particularly because the Respiridone could be administered in a liquid form.

On September 14 Ronald was on the acute corridor. He complained that the voices in his head were getting louder, that he wanted to die because doctors had made him gay. He also stated that he wanted to have a normal life.

As of September 15 Ronald was suffering miserably, awakening from sleep frightened and screaming. On September 15 he scratched his skin with a plastic fork and as result was moved from the subacute to the acute corridor.[16] On the 15th Tofani reviewed and changed Ronald's medications. He added an extra dose of Cogentin, calculated to alleviate "Parkinsonian-type side effects" of the anti psychotics; Tofani thought that these side effects might have been contributing to Ronald's agitation. Additionally, Tofani changed the schedule for administering Lorazepam to Ronald. He also gave Ronald an injection of Haldol. Tofani did not see Ronald again.

#### ii.  Disputed or qualified

The defendants state that as of September 15, Tofani determined that it was worth considering a drug named Clorazil for Ronald. Ultimately Tofani chose not to order Clozaril for Ronald. He had two reasons. One, he did not believe that Ronald was capable of giving fully informed

---

**16.** Pelletier admits these assertions and proffers the additional fact that Ronald attempted suicide on September 14. (Spiller Dep. Ex. 1 at 193, referencing logs.) I accept this as a

qualification as to the date of the incident though it is not apparent how this is material to the outcome of the motion.

consent to the administration of a medication with potentially life-threatening side effects. Two, the administration of Clozaril requires cooperation from the patient and weekly blood draws, a procedure to which Tofani was confident that Ronald would not agree. (Tofani Dep. 63, 91.) Tofani understood that Ronald's mental illness meant that he had a great deal of difficulty agreeing to changes in his medications and that he could not be relied upon to comply faithfully with medication orders. (Tofani Aff. ¶ 6.)

Advancing a claim that financial concerns motivated the Clozaril decision, Pelletier admits that these two reasons against administration existed but also alleges that Tofani had previously met resistance from CMS vis-à-vis prescribing this drug due to the expense. (Tofani Dep. at 51–52.) [17]

The defendants assert that after September 15, Ronald was not put on Tofani's weekly schedule because the mental health team perceived that Ronald was doing well. (Tofani Dep. at 62–63.) Tofani, who respected and trusted Blake's and Lipman's professional judgment, relied on Lipman and Blake in identifying the patients that needed to be seen each week. (Tofani Dep. at 82; Lipman Dep. at 78.) On September 15 Ronald slept through the night and there were no reports of inappropriate or disruptive behavior. (Blake Dep. at 44.) [18] After September 15 Ronald's agitation was decreased but he still complained of voices telling him what to do. (Id.) He was not floridly psychotic. Although he continued to hear voices, he had a presence of mind to know that it was a voice he was hearing, and was able to function and interact well. (Lipman Dep. at 51–52, 56–57.)

Pelletier asserts that other considerations were at work after September 15 in determining that Tofani would not see Ronald at his weekly visit. He cites to the following record evidence to suggest that, in fact, Ronald was not doing well. The Clinic Meeting Notes from September 15 indicate that Ronald was becoming very time consuming and remained acute; was very ill, suicidal, and in continuing crisis; complained of not sleeping well and hearing voices; and was already heavily medicated. (Pl.'s Resp. Med. Defs.' SMF ¶ 100; Pl.'s Resp. State Defs.' SMF ¶¶ 53, 63; Pl.'s Resp. State Defs.' SMF Ex. 5 at 30.) Tofani was never told that Ronald was agitated, which in Tofani's view was a concern given Ronald's history of suicidal behavior (Tofani Dep. at 74.) [19] Tofani believed that based on his experience with Ronald he would expect him to be angry,

17. Pelletier also asserts that the prison resisted the expense but the cited deposition testimony does not support this assertion; Tofani was asked if the Department of Corrections resisted this suggestion and he testified, "No, it was my understanding the resistance was from Correctional Medical Services." (Tofani Dep. at 52.)

18. Blake seems to be referring to notes that she took when giving this deposition testimony. Pelletier asserts that the general contradictions and disappearance of logs and notes casts suspicion over any information in the notes and logs turned over. (Spiller Dep. Ex. 1 at 188.)

19. Pelletier asserts that Tofani was never told that Ronald had been moved on and off the subacute corridor in the two weeks after September 15. The cited deposition testimony does not support such an unequivocal statement, in that Tofani asserts only that he did not know of one transfer on September 21. (Tofani Dep. at 70.) What is more, just prior to this statement he testified in response to a question of whether he was aware of a September 19 transfer that he didn't have a "specific memory of dates and times," but that he was aware that Ronald "along with a number of other people would move quite often from one part of the unit to the other as part of a plan." (Id. at 69.)

agitated, hallucinating, and a suicide risk at all times. (Tofani Dep. at 80.) He also indicated that someone in Ronald's state could not "contract for safety" because of constant swings back and forth between ideas and emotions. (Tofani Dep. at 84–85.) Finally, with respect to the defendants' representations concerning this period, Pelletier complains that the records are incomplete and therefore what documentation exists is of dubious value. (*See* Spiller Dep. Ex 1 at 188.)

### c. *September 16 and after*

#### i. *Not disputed*

On September 16 Ronald was moved from the acute corridor to the subacute corridor. On September 18 Ronald was moved from the subacute to the stabilization corridor. Tofani had nothing to do with these moves; he felt comfortable with Lipman and Blake making Ronald's housing arrangements. On September 18 Lipman took Ronald for a long walk. At this point Ronald was not actively psychotic and he seemed to be doing well.[20] On September 19 Ronald had an episode of acting-out during which he cried that he did not want to be in jail. Consequently he was moved briefly to the subacute corridor. Shortly thereafter he was returned to the stabilization corridor.

#### ii. *Disputed or qualified*

The defendants state that on September 28 the mental health treatment team noted that while Ronald had been very anxious and hearing voices on the previous day he had been stable over the past few weeks. (Med. Defs.' SMF ¶ 110; Blake Dep. at 15, 54.) Although Ronald did not like participating in group therapy when he first came onto the MHSU he did participate in

a session on September 28, a development that the treatment team took as healthy. (Lipman Dep. 67–68.) Blake perceived Ronald to being doing "quite well" during the last two weeks of his life in that he was interacting with other inmates, adjusting to being on the unit, and taking his medications. She understood that his auditory hallucinations were ongoing and remained a concern. (Blake Dep. at 54–55, 83–84.) She believed, based on her impression that he was generally doing well, that the medications that Ronald was taking during his final two weeks were working for him. (*Id.* at 84.)

Nothing that the mental health treatment team observed in Ronald's behavior in the period leading up to his death aroused any suspicion that he was an immediate danger to himself. (Lipman Dep. at 65–66.) Tofani perceived the relationship between the treatment team and Ronald to be one of genuine care, humanity, nurturing, and support. (Tofani Dep. at 83–84.) Tofani believed that the environment that existed in the acute corridor, the most secure area of the MHSU, interfered with Ronald's ability to recover or improve, that it actually made his condition worse, and that keeping him in this environment for his own safety was "inhumane." (To fani Dep. at 84, 94.) Lipman believed that keeping Ronald on the acute corridor for a lengthy period of time would have been "traumatic," equivalent to torture. (Lipman Dep. at 77.)

Pelletier counters that the fact that the written records are contradictory renders all the logs suspect. (Spiller Dep. Ex. 1 at 188.) He repeats his allegations that the records for the MHSU are "incomplete, incoherent, and have been tampered with." (Pl.s' Resp. State Defs.' SMF ¶ 40.) He also notes that there is no mention of

---

**20.** Though Pelletier denies the assertion in this sentence the referenced paragraphs in his response to the State defendants' statement of material fact do not contradict this statement of fact.

Ronald from September 25 through September 27 in the Daily Report Sheet or the Daily Log other than that he had been seen by an LPN on Saturday night, September 26, and no reason for the visit is given. (*See* State Defs.' SMF Ex. 2 at 530.) He observes that the clinical meeting notes for September 29 indicate that on September 28 Ronald was "very anxious and hearing voices." (Pl.'s Resp. State Defs.' SMF Ex. 5 at 31.) Furthermore, Blake testified that Ronald expressed that "he did not want to live" and that they heard these sentiments "repeatedly every day." (Blake Dep. at 71.)

With respect to the defendants' allegations that Lipman and Tofani believed that the acute corridor was detrimental to Ronald's mental health, Pelletier cites Tofani's testimony about a pre-September 15 assessment of Ronald and his conclusion that the stabilization corridor was overwhelming to Ronald because he could not tolerate a lot of stimulation. (Tofani Dep. at 45, 47.) Tofani also believed that by September 8 Ronald, continuing to deteriorate, had become "self-destructive." (Tofani Dep. at 50, 54.) By September 15 he had degenerated further, was as sick as Tofani had seen him, and was on a "downward curve." (*Id.* at 57, 59.) Pelletier notes that the clinical meeting notes for September 15 describe Ronald as being suicidal. (Pl.'s Resp. State Defs.' SMF Ex. 5 at 30.)

### Discussion

#### A. Has the Plaintiff Demonstrated the Presence of a Genuine Issue of Material Fact as to the Asserted Constitutional Violation that Prevents the Entry of Summary Judgment in Favor of the Medical Defendants?

#### 1. The Deliberate Indifference Standard

The fact that Ronald was able to commit suicide in the prison while under the care of the medical defendants does not make out a prima facie constitutional violation. The constitutional protection that Pelletier asserts was infringed is the Eighth Amendment's prohibition against cruel and unusual punishment. In cases such as this the inquiry is whether the defendants were deliberately indifferent to Ronald's medical needs (in this case his mental health and attendant physical safety).

Two cases by the United States Supreme Court frame the deliberate indifference inquiry: *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) and *Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). The *Estelle* Court identified in the Eighth Amendment protection the "government's obligation to provide medical care for those whom it is punishing by incarceration." 429 U.S. at 103, 97 S.Ct. 285. It observed: "An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." *Id.* Unnecessary suffering caused by denial of medical care is "inconsistent with contemporary standards of decency." *Id.* The Court stated:

> We therefore conclude that deliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain," proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under [§ ] 1983.

*Id.* at 104–05, 97 S.Ct. 285 (footnotes and citation omitted).

*Estelle* made clear that "inadvertent failure to provide adequate, medical care" does not rise to the level of a constitutional violation; "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.* at 105–06, 97 S.Ct. 285. "In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id.* at 106, 97 S.Ct. 285.

In *Farmer* the Court more clearly articulated the standard a plaintiff must meet to hold a prison official liable under the Eighth Amendment. It identified two prongs. First, the deprivation alleged must be "objectively 'sufficiently serious.' " 511 U.S. at 834, 114 S.Ct. 1970 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). Second, the defendant must have a culpable state of mind, which means in prison conditions cases, that the defendant was deliberately indifferent to the inmate's health or safety. *Id.*

The first prong of this analysis is readily satisfied by Pelletier; the deprivation suffered in Ronald's case is a "serious harm" by any measure. The Seventh Circuit recently articulated the obviousness of this conclusion in a prison suicide case. *See Sanville v. McCaughtry*, 266 F.3d 724, 733 (7th Cir.2001) ("It would be difficult to think of a more serious deprivation than to be deprived of life, and thus plaintiff's claim clearly satisfies the first element [of *Farmer* ]."). That panel also observed that in a case such as Ronald's there can be other injury prior to the death, such as the failure to provide treatment for mental illness can be a "serious harm" in and of itself. *Id.* at 734.

With respect to this second prong, the *Farmer* Court clarified that the requisite state of mind is reckless disregard of the risk, a terrain that is somewhere between negligence and acting with the purpose of harming the inmate. 511 U.S. at 836, 114 S.Ct. 1970. ("It is, indeed, fair to say that acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding the risk."). It is a subjective standard: the defendant must have consciously disregarded a substantial risk of serious harm. *Id.* at 839–40, 114 S.Ct. 1970.

With respect to the defendants' awareness of the risk the Court stated: "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while not a cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Id.* at 838, 114 S.Ct. 1970. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence," "and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* at 842, 114 S.Ct. 1970. Furthermore, Pelletier need not prove that the defendants were subjectively cognizant of the danger of the precise harm that befell him. *Id.* at 843–44, 114 S.Ct. 1970.

Under the reasoning of *Farmer* if Pelletier can present evidence that there was a substantial risk that Ronald was a danger to himself that was " 'longstanding, pervasive, well-documented, or *expressly noted by prison officials in the past* ' " and the circumstances suggest that the defendants were exposed to the information concerning the risk, there would be sufficient evidence for the trier of fact to find that the defendants had actual knowledge of the risk. *Id.* at 842–43, 114 S.Ct. 1970 (quoting Brief for the Respondents). If the defendants merely refused to verify underlying facts or refrained from confirming

inferences of a risk though they had a strong suspicion of impending harm, liability would still attach. *Id.* at 843 n. 8, 114 S.Ct. 1970. Conversely, the defendants might be able to show "that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." *Id.* at 844, 114 S.Ct. 1970. What is more, the defendants escape liability if they demonstrate that they were aware of the risk but responded reasonably to the risk even though they did not ultimately avert the harm. *Id.*

In cases decided before *Farmer,* the First Circuit has articulated a deliberate indifference standard that is tailored to cases involving in-custody suicide. In *Manarite v. Springfield,* 957 F.2d 953 (1st Cir.1992) the Court articulated a suicide specific deliberate indifference three-pronged standard:

> The cases also indicate that, when liability for serious harm or death, including suicide, is at issue, a plaintiff must demonstrate "deliberate indifference" by showing (1) an unusually serious risk of harm (self-inflicted harm, in a suicide case), (2) defendant's actual knowledge of (or, at least, willful blindness to) that elevated risk, and (3) defendant's failure to take obvious steps to address that known, serious risk. The risk, the knowledge, and the failure to do the obvious, taken together, must show that the defendant is "deliberately indifferent" to the harm that follows.

*Id.* at 956. *Accord Bowen v. City of Manchester,* 966 F.2d 13, 17 (1st Cir.1992); *see also Elliott v. Cheshire County,* 940 F.2d 7, 10 (1st Cir.1991) (a deliberate indifference suicide case requires a showing of a "strong likelihood, rather than a mere possibility, that self infliction of harm will occur," citation and internal quotation marks omitted). The First Circuit has yet to wrestle in a published decision with *Farmer* in the context of an Eighth Amendment deliberate indifference claim involving a custodial suicide. *See Davis v. Rennie,* 264 F.3d 86, 101 (1st Cir.2001) (discussing *Farmer* and the deliberate indifference standard, finding it an "awkward fit" for an excessive force claim by a mental institute patient); *Hasenfus v. La-Jeunesse,* 175 F.3d 68, 71–72 (1st Cir.1999) (dicta in student suicide case concerning deliberate indifference standard in prison (and mental institute) cases, citing *Farmer*); *Consolo v. George,* 58 F.3d 791, 793 & n. 1 (1st Cir.1995) (reviewing for plain error jury instructions on an arrestee's deliberate indifference to medical needs claim, rejecting argument that trial court should apply *Farmer* in context of the Fourteenth Amendment claim of a pretrial detainee).

The *Manarite* three-step analysis accords with the approach taken to in-custody suicide claims by the Seventh Circuit post-*Farmer.* To wit, the second *Farmer* prong requiring a showing that the subjective mental state of the official was one of deliberate indifference to the inmate's safety becomes a two prong analysis in which the court inquires whether there was, one, an awareness of the substantial risk, and, two, whether the defendants took reasonable steps to prevent the inmate from committing suicide. *Sanville,* 266 F.3d at 737–39. *Accord Turbin v. County of Wood,* 226 F.3d 525, 529 (7th Cir.2000) ("In order to be liable under the Eighth Amendment, a prison official must be cognizant of the significant likelihood that an inmate may imminently seek to take his own life and must fail to take reasonable steps to prevent the inmate from performing this act."). In *Brown v. Harris,* 240 F.3d 383 (4th Cir.2001) the

Fourth Circuit reflected that it was fair to extrapolate a "reasonable response" inquiry from *Farmer* vis-à-vis prison suicide claims:

> While the [*Farmer*] Court left open the question of whether the "reasonable response" prong of *Farmer* is part of the state of mind requirement or whether it instead stems from the duty to "ensure reasonable safety," *id.*, this prong nonetheless protects officials who act reasonably in response to a known risk. To the extent that the "reasonable response" prong is part of the state of mind requirement, an official who responds reasonably to a known risk has not "disregard[ed] an excessive risk to inmate health or safety," *Farmer,* 511 U.S. at 837, 114 S.Ct. 1970, and has therefore not acted with deliberate indifference.

*Id.* at 389.

### 2. *Spoliation of Evidence*

■ Before addressing whether this record demonstrates a sufficient factual dispute over whether or not any of the defendants were deliberately indifferent under the standard articulated above, I must first address Pelletier's spoliation of the evidence argument for it is integral to what the record does and does not show. Pelletier states that there are nine categories of documents, not including medication records, that are generated by the MHSU staff and medical personnel that are missing and/or have been destroyed. (1) A treatment plan was supposed to be created and updated for each inmate with specific treatment plans and goals, medication review, and recommendations for the future. The staff reports that there was such a plan for Ronald but it has not been produced. (Blake Dep. at 21–22; Tofani Dep. at 40.) (2) Progress notes for inclusion in the medical record were kept on each prisoner but pages nine and ten documenting Ronald's last weeks were removed. (Lipman Ex. 5 & Pl.'s Resp. State Defs. SMF Tab 3.) (3) Progress notes were kept by the clinical workers on each MHSU inmate and kept at the unit. The last entry for Ronald was September 28, 1998 even though the September 29, 1998, clinical notes record that Ronald was "very anxious and hearing voices" on September 28, 1998. (Lipman Dep. Ex. 2.) (4) Blake prepared a daily log of her activities and a daily report on each inmate. In the daily report other correction officers and mental health workers would make entries. Pelletier emphasizes that entries for October 2 and 3 are missing, though he recognizes that Blake was not at the MHSU on October 2 and was not scheduled to work on October 3.(5) Tofani dictated notes concerning Ronald. (Pl.'s Resp. State Defs.' SMF Tab 4.) (6) CMS, clinical members of the MHSU, and other supervisors of the MSP attended mental health clinic meetings (which it seems that Pelletier believes were somehow documented more completely than through the notes received in discovery). (Pl.'s Resp. State Defs.' SMF Tab 5.) (7) Corrections officers kept a daily log that recorded the activities of the unit. (Blake Ex. 2 at 225–530.) (8) A "constant watch log" was kept that recorded the activity of each fifteen-minute check. However, the defendants have produced the watch log for only up to August 4, 1998. (Blake Ex. 2 at 217–24.) (9) An activity or shower log was maintained but it is missing the entries from October 1 through October 3. (Pl.'s Resp. State Defs.' SMF Tab 6.)

Pelletier asserts that all of Ronald's records were removed by security after his death and the treatment plan and certain notes were never returned. He sites to the deposition testimony of Lipman and Blake acknowledging that documents are missing (Blake Dep. at 21; Lipman Dep.

at 54–55) and to the Department of Correction's subsequent report on Ronald's suicide that recognized that documents were missing (Spiller Dep. Ex. 1 at 154, 156). Pelletier argues that because probative records in this case were deliberately removed from files pertaining to Ronald and this evidence is still missing the court should draw a negative inference that the documents contained evidence beneficial to Pelletier and detrimental to the defendants.

I have reviewed the nine categories of records asserted by Pelletier to be incomplete or tampered with. The following four categories identified by Pelletier raise a concern:

1. The treatment plan for Ronald is missing though medical defendants Blake and Tofani have testified that one existed. (Blake Dep. at 21–22; Tofani Dep. at 41.)

2. At least one, maybe two pages, from the medical record progress notes that are kept on each prisoner are missing. These pages might contain information about Ronald from the period of September 14 through October 3. (Pl.'s Resp. to State Defs.' SMF Tab 3 at 16–17, 19.) I say maybe two because the page bate stamped "17" which ostensibly is page nine of the progress notes, is in an entirely different pre-printed format than the other pages in this sequence. It has the beginning of an entry for September 15 scratched out and then one entry for September 28, about an assessment per request, then a large space-filling "X." The numbers "9" and "pg 10" in the

right hand top corner are scratched out. There is no "ID Number" space on this form as there are on all the other odd numbered pages in the sequence, and Ronald's number, 28050, nowhere appears on this sheet. The first entry on the next page, bate stamped 19, is on October 3, at 6:00 p.m., and concerns the suicide.

3. The progress notes kept on the MHSU on each MHSU inmate by clinical workers ends on September 28, 1998. (Lipman Dep. Ex. 2.) And while most gaps in this sequence are at most a couple of days (appearing to fall on the weekend), there are no entries for the five final days of Ronald's life.[21]

4. The stabilization unit also keeps a separate daily activity log on each inmate. (Pl.'s Resp. to State Def. SMF Tab 6.) The defendants have not produced the log sheet recording October 2 and 3.

The remaining categories are not on their face suspect. Three other categories of records identified by Pelletier—Tofani's dictated notes, mental health clinic meeting notes, and a daily log of activities on the MHSU—do not have any apparent gaps. Pelletier's complaint about two other categories of records seems to fall off the mark. Pelletier asserts that there are "missing pages" for October 2 and 3 from a daily report "blue book" kept by Blake. He concedes that Blake was not at work on Friday, October 2, and was not scheduled to work October 3. In an effort to support his contention that pages are "missing," Pelletier contends that this blue

---

21. I note that there are no entries for August 1 through August 6. However, though the bate stamp for this period goes in sequence from 74 to 75, page 74, chronicling July 30, through July 31, is on a different pre-printed form than the remaining sheets and perhaps a sheet got lost in the shuffle. The last page bearing a single entry for September 28 is the only page in this sequence that does not have Ronald's MDOC number on it.

book also contains some entries by corrections officers and other mental health workers, identifying only two times when this happened in the period between August 19 and October 1. He also contends that the MHSU keeps a "constant watch log" recording the activity for each fifteen minute check. He complains that the defendants have produced pages covering only July 30, July 31, and August 4. (Blake Dep. Ex. 2 at 217–24.) However, this record appears to represent a log of a specially ordered constant watch covering Ronald and another inmate only, and is not something kept on each inmate (or Ronald alone) on a regular basis.

Because none of these CMS defendants had any direct involvement with Ronald during October 2 or 3, only those "missing" records from earlier in time could have any relationship to them. Of those records that have "gone missing" the only one probative as to these defendants is the missing treatment plan. The parties have testified to the treatment plan they had in place and the fact that the written plan cannot be located could, at best, permit an inference that they negligently failed to reduce their plan to writing. There is no inference that can reasonably be drawn from the missing records that would be relevant to the issue of whether these defendants were deliberately indifferent to Ronald's serious medical needs.

### 3. Pelletier's Argument Concerning the Medical Defendants' Liability

#### a. Cecelia Blake

Pelletier argues that, while Blake might have had good intentions, she was not prepared for her job responsibilities and was inattentive to Ronald's needs. He argues that a jury could infer deliberate indifference by juxtaposing the fact that she made so many entries in the logs prior to September 15 with the fact that there are so few in the record thereafter. However, that Blake's testimony concerning the relative improvement in Ronald's condition during that period was accurate is an equally supportable inference to be drawn from the fact that there are fewer entries. It is not the sort of evidence that supports a finding of deliberate indifference.

■ Pelletier also urges that after September 15 all the members of the treatment team knew that Ronald's psychosis was not under control yet no one, Blake included, took steps to determine the reasons for his weekend decompensation. However, the record supports Blake's testimony that Ronald's condition was changeable and that some days he appeared to interact appropriately. The last entry in her log was September 30 when she went out to the yard to exercise with Ronald and another inmate. Blake worked October 1 and made no entry regarding Ronald. She never saw him again. The most damaging statement to be made against Blake is that she never recognized a pattern of decompensation occurring over the weekends that Dr. Peterson and Spiller both discovered during the post-mortem reviews. Blake's relatively short time in the position, her undisputed "good intentions," and her lack of personal knowledge about Ronald's state in the last two days of his life negate the benefit of any inference that her failure to detect a "clear" pattern of weekend decompensation might generate. Pelletier's claim against Blake does not amount to deliberate indifference to serious medical needs.

#### b. Michael Tofani

■ Pelletier charges Tofani with ad-

ministrative negligence.[22] He states that Tofani knew that Ronald was psychotic and suicidal at all times; that he was incapable of contracting for safety; that he decompensated on the weekends; and that as of September 15 he was the sickest Tofani had seen him, the clinic meeting notes for that date describing him as suicidal. Yet Tofani did not attempt to monitor Ronald or to verify that Ronald was stable. Pelletier tethers Tofani's lack of follow-through to CMS cost constraints. In support of his argument he points to Defendant Briggs's attendance at the meeting at which the consensus was that Ronald was becoming time consuming, remained acute, was very ill, was suicidal and in continuing crisis, complained of not sleeping and of hearing voices, all despite his heavy medication. At this meeting no treatment plan was discussed. There is no further indication in the logs and notes that Tofani's suggestion of Clozaril be pursued. After September 15, Pelletier asserts, the treatment and records fall off significantly.

Pelletier contends that it is fair to draw the inference that Tofani made a deliberate decision to scale down Ronald's care for financial and administrative reasons, rather than medical reasons, and that if that inference were drawn it would suffice to establish deliberate indifference. The theory that Tofani acted to please undisclosed CMS personnel when he decided not to pursue Clozaril or other treatment alternatives is nothing more than a theory. There is nothing in this record by way of evidence that supports the argument that any decision was made by the treatment team in this case as the result of financial considerations. Lipman and Blake did not request that Tofani see Ronald again after

September 15 and he never seized the initiative to do so, although the record does support Pelletier's contention that Tofani could have exercised his independent judgment about which inmates he saw during his weekly visit. Tofani's decision to abide by Lipman and Blake's conclusions about Ronald's generally improving, or at least stable, condition might have been ill advised and professionally unsound given what he knew about Ronald. However, on this record his conduct does not support a finding of deliberate indifference under the *Farmer* standard.

### c. Bert Beverly

█ Pelletier admits that the record against Beverly is "sparser." He states that he was the first and last physician to treat Ronald. He is also accountable in Pelletier's view because he was the Medical Director of CMS, a member of the treatment team, and he had authority to order an inmate placed on the acute or subacute corridors. Somewhat halfheartedly he asserts that Beverly's "level of knowledge and the nature of his obligations should be determined by a jury." Beverly had no significant role in the mental health treatment decisions regarding Ronald and there is no evidence to support a finding against him.

### d. Allen Briggs

█ Finally, with respect to Briggs, Pelletier argues that he should be held liable because he participated in the mental health clinic meetings during which treatment decisions were reviewed and he had the authority to approve of increases in psychiatric care. He speculates that, as the regional supervisor of medical services for CMS, Briggs "would have provided the

---

22. Pelletier mentions supervisory liability in connection to Tofani but has not provided anything upon which this court could base a conclusion that Tofani had supervisory responsibilities.

'resistance' to more costly forms of medication." Once more Pelletier returns to his "theory" that financial considerations drove the post-September 15 treatment decisions regarding Ronald. There is no evidence of Briggs applying any pressure on Tofani or anyone else regarding treatment decisions and allowing a factfinder to speculate about such conduct by Briggs would be impermissible, especially in a case where the record evidence reveals that Lipman, a state defendant and not an employee of CMS, was the actor who had primary control over the treatment and placement decisions regarding Ronald during the pivotal last weeks of his life. Of course denying needed medical treatment purely because of cost considerations would indeed amount to deliberate indifference to serious medical needs in a situation were the defendant either knew of or consciously disregarded a serious risk of self-inflicted harm. The problem for Pelletier is that there is no evidence, direct or circumstantial, to support the conclusion that Briggs or any of the other medical defendants acted as they did because of financial considerations.

### Conclusion

Based upon the foregoing, summary judgment is **GRANTED** to Tofani, Blake, Beverly, and Briggs.

*So Ordered.*